Thank you, Your Honor. Good afternoon, and may it please the court. I am Andrew Pappas of the Arizona Attorney General's Office, appearing on behalf of defendants' appellants, Bennett and Swaney, and I'd like to try to reserve about five minutes for rebuttal. The question at the center of this appeal is whether controlling precedent holds that the defendants, two correctional officers, violated an inmate's constitutional rights by relying on and deferring to the medical judgments of the nurses who were treating him. There is no such precedent. On the contrary, in the case most closely on point, King v. Kramer, the Seventh Circuit held that correctional officers were not deliberately indifferent on facts far more striking than these. The defendants are entitled to qualified immunity as a matter of law, and the district court's orders denying them such immunity should be reversed. The plaintiff must clear a high bar in order to overcome the defendants' qualified immunity defense. State officials, like the defendants, are entitled to qualified immunity so long as none of his courts or the Supreme Court's precedents squarely govern the facts of the case. This means that Mr. Montego must show that existing law places the constitutionality of defendants' conduct beyond debate. Counsel, this is Judge Kramer. I have a factual question for you. As I understand it, at least Officer Bennett did not know of any bona fide medical opinion that he could have relied on, and I believe also that the plaintiff told Bennett that he was not getting any help from the nursing staff. So why doesn't that differentiate this from the case that you cite? Two responses, Your Honor. First, both defendants, both Officers Bennett and Slaney, were indeed relying on bona fide medical opinions. I know that Mr. Montego argues otherwise, but I believe the basis for that argument and the basis for the court's conclusion on that point, the district court's conclusion on that point, was that they were relying on medical judgments of nurses and not doctors. And there is no authority, and Mr. Montego has cited none, holding that only doctors may render the kinds of medical judgments that correctional officers may rely upon. Counsel, that actually wasn't my question. It's more precisely that the plaintiff told them that he wasn't getting care from the staff, and that whatever care he might have been getting was inadequate. So that's really what I'm trying to get at, I think. I understand, Your Honor. On that separate point, again, I think the case law points in the other direction. I would refer, Your Honor, to the case called Hayes v. Snyder from the Seventh Circuit, in which that court rejected precisely this argument. In that case, much like here, there had been an allegation that the inmate had told guards that he didn't like the care that he was getting or that he didn't think he was getting adequate care, but that wasn't enough. What the court held in that case was that non-medical defendants were entitled to rely on the professional judgment of medical professionals, even though the inmate claimed that doctors refused to respond to his pleas for treatment, but nothing in the doctor's report said it's obvious that he might not be receiving adequate care. In other words, correctional officers don't have to rely upon the medical opinions or the opinions about the care they're receiving that inmates articulate. On the contrary, correctional officers can rely on the medical judgments of the nurses or other medical staff who are treating the inmates. In fact, this court has held a number of times that correctional officers need not defer to inmates' judgments about the adequacy of medical care that they're receiving. The court has held, for example, that a mere difference in medical opinion between a prisoner and prison medical officials is insufficient as a matter of law to establish deliberate indifference. So it follows as a matter of logic that correctional officers need not defer to inmates' judgments about the adequacy of the medical care they're receiving. Excuse me, this is Judge Schroeder. I also have a question about the record, if I may. Did Sweeney say that at one point in the record that he wasn't personally aware if the plaintiff had been seen by medical staff? Your Honor, the testimony on that point is a little muddled, to be sure. The district court, of course, cites some of that testimony in its order. What I think is uncontroverted in the record is that Sweeney did indeed talk to medical staff. Sweeney testified, for example, that he had gone to see medical, I think, after he spoke to Montego, and that medical told him that they had the situation under control and there was nothing left to do. Quite candidly, I think the district court, on this point, ignored undisputed testimony that he had indeed talked to medical. But yes, Your Honor, I think there is some less than crystal clear testimony in the record on that point. But not enough to create a question of fact? Is that your position? Not enough muddle? Certainly not enough to create a question of fact about whether or not Sweeney did indeed talk to medical, which I think is the key point here. The question really is, was Sweeney relying on medical judgments of nurses? And the answer is yes. The district court said no because it thought that Sweeney had to talk to the nurses before he interacted with Montego rather than after he interacted with Montego. Of course, there's no case law holding anything like that, and that sort of rule really wouldn't make much sense in any event. In terms of the case law that I think does point the way on this case, again, I refer the court to the Seventh Circuit's decision in King v. Kramer, and I think the facts in that case are so striking that they really do bear discussing in some detail. In that case, two correctional officers found a prisoner convulsing on the floor, screaming and foaming at the mouth. They called for a nurse. When the nurse arrived, she tried to pull a pulse oximeter on the inmate's toe, but his shaking was too intense to keep it on. One of the officers told the inmate to quit acting like a child and get up and accused him of faking a seizure. The nurse couldn't get a blood pressure reading because the prisoner was shaking so hard. She then used smelling salts to try to look for a reaction, but there was none. In fact, the inmate's face turned blue. And yet the officers and the nurse, convinced that the prisoner was faking, left him lying on the floor. They did not contact the on-call physician or emergency medical services. The Seventh Circuit, in the opinion by Chief Judge Wood, upheld summary judgment in favor of the officers, concluding that they were not deliberately indifferent. The court concluded the officers, quote, were not responsible for administering medical care to the prisoner. Rather, they were entitled to defer to the judging of the jail health professionals, in that case the nurse, as long as they did not ignore the prisoner. The court rejected the argument that the officers were aware that the nurse was improperly treating the prisoner. They were not trained to assess whether an inmate is genuinely experiencing seizures, and so they lacked the capacity to judge whether Kramer, the nurse in that case, made an inappropriate diagnosis. And I would submit that if the officers and King were not deliberately indifferent, then Officer Bennett and Officer Sweeney cannot possibly have been deliberately indifferent. At a minimum, it is not clearly established that they were. And just to emphasize the point, to the extent that King places any doubt in anyone's mind that the officers here were not deliberately indifferent, then as a matter of law, the court must grant them qualified immunity. That's what the court's decision in Hanby says. That's what the governing precedent from the Supreme Court says. But unless the governing case law, unless governing precedents place the constitutional question beyond dispute, then the defendant officers are entitled to qualified immunity as a matter of law. In this case, the facts are somewhat similar, but much less egregious than the facts in King. Judge Steiler, I want to ask you a question about this. When did Officer Bennett know about the fact that they were complaining of their bad health there? Was it before he talked to the nurses or after he talked to the nurses? That's a good question, Your Honor. The district court focused on Bennett's contacts with Mr. Monteco on two days, July 30th and 31st. As for the first date on which Bennett was aware that the inmates were complaining about their health, I actually don't know that there's a finding on that point in the record. To the extent that there is, I just unfortunately don't know what it is. But I know, for example, that the district court based its ruling on the qualified immunity point on Bennett's interactions over the course of two days, July 30th and 31st. Your Honor, I see that my ten minutes has expired, and I was hoping to reserve five for rebuttal. No, we were supposed to get something from the deputy at the two-minute mark, so you may have two minutes for rebuttal. I'm sorry, Judge. I understood that I had 15 minutes for argument and that I was trying to reserve five for rebuttal. I'm sorry. I thought we had... I'm sorry, Judge. The day sheet reflected 15 minutes per side. 15 minutes. Right. Well, my mistake, so go for it. Okay. Okay, shall I sit down then? Well, if you want to save that time, and it sounds like you have the full five minutes that you requested. I would prefer to save the five for rebuttal, Your Honor. Thank you so much. We'll hear from Mr. Weeks. Hi, Stephen Weeks, Your Honors. On behalf of Mr. Montillo, the defendant happily, this is a pretty straightforward case. In Arizona, registered nurses are not allowed to diagnose or treat inmates. They are allowed to assess. They are allowed to take vitals, but at the end of the day, the decision is for the physician or a nurse practitioner or somebody higher level than just a registered nurse. And in this case, it's undisputed that Mr. Montillo contracted botulism after eating some food that he had shared with three other inmates. Because he contracted botulism, he started to exhibit signs of botulism between 24 and 72 hours after ingesting the food. And botulism is not like a common cold. It doesn't just disappear over time. Here, Mr. Montillo was seen, if you look at page 10 of the plaintiff's brief, he was seen and was noted to have droopy eyes and to appear drugged, which is what you would expect from somebody who has contracted botulism. Because what will happen is all of the muscles will slowly but surely start to fail. So the eyelids will start to droop. The ability to breathe will be diminished. The ability to stand will be diminished. The ability to talk will be hindered. It's pretty common that these effects will happen to people who have had some food that is contaminated with the botulism toxin. The only way to cure that is to go to the hospital and get the antitoxin. Now, in this case, one of the four inmates who contracted botulism was sent to the hospital. Three of the inmates were held in their cells. I represent two of those inmates, Mr. Montillo and Mr. Lopez, who were both cellmates at the facility. Now, the second day after the symptoms progressed, the nurse noted in her records, and, again, this is at page, I think, 10, yeah, 10, that Mr. Montillo reported the symptoms and that Mr. Montillo's eyes were droopy and it appeared he was under the influence of drugs or alcohol, but there was no throat or tongue swelling and his respirations were clear. So that is an assessment where they say, okay, this guy is not looking good, but that's all that they can do. From that point forward, it has to go to a doctor. If it doesn't go to a doctor, then there is a problem in the system somewhere. Now, what can an inmate do who is locked up 23 hours a day inside of a cell? They have a choice. They can either ignore it and just kind of sit back and wait and see if they improve, or they can ask for assistance. And that is what happened with both of my clients, both Mr. Lopez and Mr. Montillo. They requested assistance. They told both Correctional Officer Bennett and Correctional Officer Sweeney that they were not seen by a doctor. Now, the state is arguing, hey, it doesn't matter, they were seen by a nurse, that's good enough. But even their own citations disagree with them. The citations state in the Cain case that so long as the inmates were being seen by a doctor, then the Correctional Officers could rely on it. Several other cases that they rely on also mention the same thing. As long as a medical professional authorized to look at, diagnose, and treat, those are the only individuals who are important here. A nurse who cannot diagnose, cannot treat, cannot order an inmate sent to a hospital does not have the same authority as the medical professional who is hired to make those types of decisions. And here, it's admitted. Counsel, I have a question about that. I know you won't necessarily agree with the factual premise of this question, but assume for this question that the Correctional Officers were under the mistaken legal impression that nurses could be medical professionals on whose opinions they could rely and assume further that they were expressly told by the nursing staff, we've assessed these folks and we're treating their symptoms and there's nothing you need to be concerned about. What would be the result on qualified immunity? Sure. The first step is just like a Correctional Officer does not need to have read every case that has ever been decided on the qualified immunity in order to be held responsible, as long as they know that they have a legal duty and the legal duty is already established at law. And in this case, it is established in Arizona and I believe the entire country that nurses are not allowed to do the diagnosis, they're not allowed to do the treatment, they're not allowed to do those things, then... But you're sort of evading my question in a sense because the Correctional Officers are being told by the nursing staff, and I know you disagree with the factual premise of this, but suppose they've been told unequivocally we're taking care of their medical problems, you don't need to be concerned, we've got it under control. You know, do they have to go beyond that, either factually or legally? And my apologies, I think my answer to that is, yes, they must, if they see somebody. For example, if they see somebody inside of a cell that has a compound fracture of their arm, the bone is sticking out, and they're bleeding everywhere. If a nurse comes to the cell and says, nah, it's all right, it's just a flesh wound. I mean, going back to some of the old movies that I've watched before. Yes, they still have to make sure that the inmate is treated. They can't just sit back and rely on it. And in this case, we have multiple instances where the inmates were collapsed on their floor. Mr. Montillo was collapsed on his floor, unable to breathe, unable to eat, unable to do anything that is expected of somebody who is healthy. And the nurse says, you know what, his vitals are good, that's good enough for me. If the officer believes that the individual needs to see a doctor, and this is botulism, it's not something that cures instantly. So all that happens is the paralysis and everything gets worse.  then they have to question the nurse, especially given that the nurse is not allowed under Arizona law to make any sort of diagnosis. Can I ask you a question? Sure. What is the duty of the officer once he tells the nurses and they say he's not sick? Where does he go from there? Sure, Your Honor. It's actually very simple. The first thing that an officer should do is contact his or her supervisor. You contact his or her supervisor and say, hey, I got an issue here with this inmate, especially when it's not just one, but it's four. One gets taken to the hospital, three are stuck in their cells. You got four inmates who come down with something that appears to be something that is preventing them from even being able to walk, swallow, breathe, et cetera. If the nurse says, it's okay, then you go to your supervisor. The supervisor then says, no, it's fine. They have another step that they can go to, and that's what's called an ICS, Incident Command System, I believe is what it stands for. And what that does is that it immediately cuts everything off. It's basically they press a button on their walkie-talkie, they say, you know what, I need a doctor over here, or I need somebody who's able to diagnose. It's a relatively simple, easy thing. Instead of leaving somebody in their cell for seven days until they confess to having consumed an illegal beverage in order to get medical treatments. Does that answer your question? Well, no. These officers, I guess, have a command system, and if he says to his superior officer, these guys are sick, and the superior officer said no, they've been taken care of by the nurses, is he supposed to go above his supervising officers and go to the warden or ring this bell or whatever this alarm is? It's kind of an insubordination system, it sounds like, that you're pushing for. Right. I mean, that is what it is. I mean, the reason for the ICS system is to allow an override if the individual correctional officer believes that something is not being done properly. Because correctional officers are legally responsible for both the health and welfare of their inmates. So if you have an officer who sees somebody who is unable to get up off the floor or has a compound fracture or whatever the issue is, and they first call their commanding officer and the officer says, don't worry about it, they have a right and the responsibility to say, look, I'm not going to let that guy bleed out on the floor. I'm going to go ahead and call an ICS so that the medical professionals will actually come here and do a full evaluation. Now, I mean, it's important to remember that for a week, for one week, nobody able and authorized under Arizona law ever saw any of these inmates, except for the one who was immediately taken to the hospital. The other three were left to slowly but surely deteriorate over time as the botulism went through their body and their system. You don't lose those symptoms. You are a victim of botulism that needs to be treated with some antitoxin. That's how you cure it. And so if you've got somebody who is showing symptoms on day two and you have a whole bunch of officers saying, I didn't see anything, even though on day two the medical records show that the individual was incapacitated, then yes, they have been deliberately indifferent to that individual's pain and suffering. Did that answer it better? Well, to some degree, but deliberate indifference is a very high standard, and you're saying that if the nurses say he's okay and his supervising officer says okay, he must pull this alarm or he's deliberately indifferent, whereas these other people have already been deliberately indifferent, it seems to me. And perhaps I'm not understanding your question, but I think that we're on the same page. What I'm saying is that the individual officers have to make their own judgment call to not be deliberately indifferent. I mean, if you have an officer and the supervisor both seeing somebody bleed out on the floor in their cell, you can't just say, well, my supervisor said it was okay. You still have to take that next step. And here, where you've got people who can't walk, who can't breathe, who can't eat, who can't drink, who are vomiting, who are exhibiting all kinds of signs of having an illness that, who knows, could spread throughout. I mean, the officers, I'm not saying they have to know that it was botulism. It could have been some sort of weird flu. Sorry to interject. This is the deputy. There are about two minutes left. Okay, thank you. Then what you need to do is you need to make sure that the individual is at least analyzed and looked at by somebody authorized under Arizona law to do so. And that is a licensed practical nurse, a nurse practitioner, or a doctor. And in this case, as soon as my client was seen by somebody authorized to make a diagnosis, he was transported to a hospital because he was dying. But nobody would let him see a doctor while he was dying for a week. And the reason behind it, according to Mr. Sweeney's testimony, was that they wanted a confession so they could backcharge the health care costs to my client. And so not only does it seem deliberately indifferent, but it also appears that there was a motive behind the denial of care, and that was to make my clients responsible for the cost of their care. Thank you, Counsel. Your Honor, this is Andrew Pappas again. I'd like to pick up where Mr. Weeks ended, which was this assertion that Officer Sweeney somehow testified that they wanted to coerce a confession in order to backcharge Mr. Montijo for his care. Your Honor, that argument doesn't appear anywhere in Mr. Weeks' briefs and Mr. Montijo's brief. That was not preserved. That is not part of the district court's findings. Counsel, the only issue in front of us is whether there is or is not an issue of fact that would preclude qualified immunity at this stage. And aren't we required to examine the whole record in determining that?  That's a different question. You said earlier that we can't think about it, and I'm questioning that because it seems to me that regardless of whether a specific piece of evidence was pointed to in a brief or an oral argument, it really doesn't change our duty to examine the whole record to determine whether the district court's conclusion is correct. Your Honor, the district court did not find a dispute of fact on that issue. The district court, in fact, found that Mr. Montijo had testified during discovery that he had no recollection of having interacted with Mr. Sweeney, with Officer Sweeney, on the day in question, August 2nd. This is in pages 24 and 25 of the record. So this is, if anything, this is not just something that was waived but withdrawn on Mr. Montijo's part. I certainly don't think it's this court's job to go searching for disputes of fact, especially where this case can be disposed of on purely legal grounds. I would also note that in my opponent's 15 minutes, I think he cited only one case, King v. Kramer. That is because there is absolutely no authority whatsoever that supports this position. In fact, a number of things he said are simply contrary to law. He said, for instance, that under Arizona law, a nurse can't diagnose a patient. He's never cited a statute on that point, and I'm aware of none. He said that if an officer believes that an inmate needs to see a doctor, then he has to question the nurse. I'm aware of no case that says that. He says that an ICS, an incident command system, exists so that correctional officers can override the judgments of nurses. I am aware of no case holding that or any fact in the record to that effect. He says that an officer, the first thing he must do is contact a superior officer. Again, there's absolutely no case that I'm aware of that holds as much. Our burden is not to show, as a matter of law, that the defendant's conduct was constitutional. It is Mr. Montico's burden to show that the controlling precedents squarely governing the facts of this case hold that their conduct was unconstitutional. In the absence of such controlling precedents, then the defendants are entitled to qualified immunity as a matter of law. I'm sorry to interrupt. There's about one and a half minutes left. Very well. Just one last point, then, to return where I began, I guess, which is with King. You know, Mr. Weeks said a moment ago that in King, the Seventh Circuit had held that unless the prisoner saw a doctor, then the officers couldn't rely on the medical judgments of the nurse. That is simply not true. In fact, in that case, the on-call physician was not called, and yet the Seventh Circuit found that the officers were not deliberately indifferent and were entitled to qualified immunity as a matter of law, having relied on the judgments of the nurse. I think that case all by itself disposes of all the legal questions in this case. It shows that officers can reasonably rely on the medical judgments of nurses. They don't need to wait for doctors. And it shows that there is no consensus of authority squarely holding that the officers' conduct in this case violated the inmates' constitutional rights. That being the case, the officers are entitled to qualified immunity as a matter of law. Thank you so much. Thank you, counsel. The case just argued is submitted, and we very much appreciate, again, that you were all willing to do this rescheduled argument by phone, and we appreciate your helpful arguments. Thank you. We are adjourned, and I'm going to hang up. Thank you. Thank you. Bye-bye. Thank you. Thank you.
judges: Siler, Schroeder, Graber